MARK J. BENNETT          2672
Attorney General of Hawaii

DENNIS K. FERM           2643
JOHN M. CREGOR, JR.      3521
Deputy Attorneys General
Department of the Attorney
 General, State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone:  (808) 586-1494
Facsimile:   (808) 586-1369
Email: John.M.Cregor@hawaii.gov

Attorney for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTHONY NESBIT,<br><br>               Plaintiff,<br>vs.<br><br>DEPARTMENT OF PUBLIC<br>SAFETY, STATE OF HAWAI`I, et. al.<br><br>               Defendants. | CIVIL NO. 03-00455 SOM-KSC<br>(Consolidated)<br><br>**DEFENDANT RANDY ASHER'S RESPONSES TO THE PLAINTIFFS' FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANTS** |
| WILLIAM KOTIS,<br><br>               Plaintiff,<br>vs.<br><br>STATE OF HAWAII DEPT. OF<br>PUBLIC SAFETY, et. al.<br><br>               Defendants. | CIVIL NO. 04-00167 SOM-KSC<br>(Consolidated) |

184457_1.DOC

## DEFENDANT RANDY ASHER'S RESPONSES TO THE PLAINTIFFS' FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANTS

COME NOW DEFENDANT RANDY ASHER, by and through his

attorneys, Mark J. Bennett, Attorney General of Hawaii, and Dennis K. Ferm and

John M. Cregor, Jr., Deputy Attorneys General, responds to **PLAINTIFFS'**

**FIRST REQUEST FOR ANSWERS TO INTERROGATORIESTO**

**DEFENDANTS** as modified and limited by United States Magistrate Judge Kevin

S.C. Chang's Order of December 7, 2005, and attaches these answers hereto.

Answers from the remaining defendants will be transmitted as they are received by

counsel.

DATED:    Honolulu, Hawai'i, March 31, 2006.

JOHN M. CREGOR, JR.
Deputy Attorney General
Attorney for Defendants
DEPARTMENT OF PUBLIC
SAFETY, STATE OF HAWAII,
JAMES L. PROPOTNICK, FRANK
LOPEZ, EDWIN SHIMODA,
NOLAN ESPINDA, ERIC
TANAKA, RANDY ASHER, SGT.
SAIA FINAU, CINDA SANDIN,
MONICA LIRTZ, CHERYL
ZEMBIK, LYLE KANOA, G.
SHERIDAN, and DAVID APAO

## RESPONSES TO INTERROGATORIES FROM
## DEFENDANT RANDY ASHER

1.    Please state name, position and duties.

      Answer:

      **Randy Asher.**
      **Deputy Warden**
      **Retired in June 2004**
      **Overseeing/managing the security of Halawa Correctional Facility.**

2.    Were you trained in regards to prison gang management and control what
      training or instructions did you have concerning policy and procedures
      concerning prison gang members.  When were you trained what was
      involved and how long was the training or instruction.

      Answer:

      **No training.  Except awareness of existing policy.**

3.    Were you specifically trained or instructed in regards to the challenged
      housing practice of separating prison gangs form rival prison gangs and
      housing them in certain areas of Halawa prison (Quads) to what extent did
      you understand that this housing practice could be applied (in other words
      was it allowed to house a regular inmate (non-gang) member in with
      separated prison gang members.

      Answer:

      **Unless there is a known direct threat with evidence, reasonable**
      **separation will be done.  Other than that, it's common to have**
      **gang/non-gang members housed together.**

184457_1.DOC

4.      How long has the practice of separating rival prison gangs been in effect and what are the reasons for separating the rival prison gangs?

Answer:

**Don't know how long it is or was in effect. Separation is only done if there is clear evidence of violent interaction.**

5.      Did you know that a regular inmate (non-gang member) could be housed with separated prison gang members (if answer is Yes what do you think about this practice?)

Answer:

**Yes, due to prison space availability as well as no known conflict between the aforementioned situation.**

6.      What is a Quad (how many inmates in a Quad) (about how many if exact number is not known).

Answer:

**Quad is a part of a housing unit but do not remember how many inmates housed in a Quad.**

7.      How many separated prison gang members were in a Quad at one time (about how many).

Answer:

**I don't know.**

8.    How many separated prison gang members were allowed in a Quad.

Answer:

**I don't know.**

9.    What Quads in Halawa Medium and High Security Facility did separated prison gangs occupy?

Answer:

**I don't recall.  I presume all Quads had separate prison gangs at one time or another.**

10.    Since rival gangs were separated why didn't they separate regular inmates (non-gang) from separated prison gang members?  Do you think they should have been separated (why or why not)?

Answer:

11.    Do you know of any regular inmates that were victimized when housed with separated prison gang members (describe).

Answer:

**I don't recall.**

12.    What are the policies or practices concerning the housing of a regular inmate with separated prison gangs?

Answer:

**Since I'm retired, I don't remember.  I'd have to review the policy.**

13.    How many regular inmates (non-gang) requested protective custody for the last 5 years because they were beaten, threatened, or extorted by separated prison gang members.  (some – a lot – plenty – a whole lot)?

Answer:

**My best recollection is some.**

14.    How many Grievances for the last 5 years did you receive or know of that complained of prison gang members threatening, extorting, or assaulting inmates (some – a lot – plenty – a whole lot)?

Answer:

**My best recollection is some.**

15.    Does the separation of rival prison gang members exist in both Medium and High Security Facilities?  Who authorizes?  This when and how long did this exist?

Answer:

**Yes.  Gang Intelligence Officers in consultation directly with warden under Warden C. Frank.  Under Warden N. Espinda is through chain of command chief, deputy warden to warden.**

16.    Who do you know of including yourself if involved specifically authorized, allowed, approved of the practice of separating rival prison gangs and then housing a regular inmate in with them. When did you come to know this?

Answer:

**My best recollection on this, is the Gang Intelligence Officers advisement and consulting with the warden before final decisions are made. This methodology was under Warden C. Frank. Under Warden N. Espinda the process proceeded through a chain of command chief, deputy warden through warden and in reverse if anyone of the mentioned is not available.**

17.    When was the prison gang intelligence unit and task force created? What is there function? What do they accomplish? Who is in charge? And how many make up the task force?

Answer:

18.    Who's decision was it to create the gang task force intelligence unit. Why was it created or why do you think it was created, when was it created?

Answer:

19.    Are prison gangs a threat and danger to public order and safety (if Yes why if no why).

Answer:

20.     Are prison gangs a threat and danger to regular inmates (if Yes why if no why).

Answer:

**It can be, but not necessary, it all depends on the intelligence information we have beforehand.  If no information it is indeed no more dangerous than any other inmate.**

21.     What kind of screening procedures and classification procedures were used to determine compatibility between regular inmates (non-gang members) and separated prison gang members that they were ordered to be housed with them.

Answer:

**Deputy Warden E. Tanaka is in charge of the residency housing units Classification or screening procedures comes directly under his command.**

22.     Do you know of any abuses in the housing practice such as guards putting a regular inmate or gang member in with separated prison gang members so he will be beaten (names need not be mentioned but may be) describe as best you can.

Answer:

**To my best recollection this never occurred.**

23.     What is the nature and character of prison gangs?  What is there purpose, goals, agenda?

Answer:

24.     Do you know what the right to safe custody policy says. What do you think
        it means.

        Answer:

        **To my knowledge it means that every incarcerated individual.**

25.     Are you aware that you have a duty to protect prisoners from a foreseeable
        harm. Explain what your understanding of this is?

        Answer:

        **Absolutely! It is our duty and expectation that we must do everything
        humanly possible to protect all inmates from any physical harm. I
        believe that this is a constitutional right.**

26.     Are prison gangs dangerous and who are they a danger to? Please describe.

        Answer:

        **Yes, they can impose a danger between various gangs as well as with
        their own gangs. It all depends on the conflicts they are experiencing.**

27.     Are prison gangs a threat to prison security? If Yes why? If no why?

        Answer:

        **Absolutely! If they become a unified or organized force to disrupt the
        establishment or institution, security then becomes compromised or at
        risk. Violence as well as the flow of contraband.**

28.  Do you think that housing a regular inmate (non-gang) with 15 separated prison gang members is dangerous to that regular inmate?  If Yes why?  If no why?

Answer:

**Not necessary but possible.  Being forced to join the majority unless the non affiliated gang inmate is strong enough to withstand the pressures of the gang.**

29.  [missing]

30.  How many inmates have been injured in gang violence that you know of? Are there any specific incidents that come to mind.

Answer:

**I don't recall how many nor do I recall any specifics.**

ASHER