MARK J. BENNETT          2672
Attorney General of Hawaii

DENNIS K. FERM           2643
JOHN M. CREGOR, JR.      3521
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone:  (808) 586-1494
Facsimile:   (808) 586-1369
Email: John.M.Cregor@hawaii.gov

Attorney for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTHONY NESBIT,<br><br>               Plaintiff,<br>   vs.<br><br>DEPARTMENT OF PUBLIC<br>SAFETY, STATE OF HAWAI`I, et. al.<br><br>             Defendants. | CIVIL NO. 03-00455 SOM-KSC<br>(Consolidated)<br><br>**DEFENDANTS DAVID APAO AND<br>NOLAN ESPINDA'S RESPONSES<br>TO THE PLAINTIFFS' FIRST<br>REQUEST FOR ANSWERS TO<br>INTERROGATORIES TO<br>DEFENDANTS** |
| WILLIAM KOTIS,<br><br>               Plaintiff,<br>   vs.<br><br>STATE OF HAWAII DEPT. OF<br>PUBLIC SAFETY, et. al.<br><br>             Defendants. | CIVIL NO. 04-00167 SOM-KSC<br>(Consolidated) |

## DEFENDANTS DAVID APAO AND NOLAN ESPINDA'S RESPONSES TO THE PLAINTIFFS' FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANTS

COME NOW DEFENDANTS **DAVID APAO** and **NOLAN ESPINDA**, by and through their attorneys, Mark J. Bennett, Attorney General of Hawaii, and Dennis K. Ferm and John M. Cregor, Jr., Deputy Attorneys General, respond to

**PLAINTIFFS' FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANTS** as modified and limited by United States Magistrate Judge Kevin S.C. Chang's Order of December 7, 2005, and attaches these answers hereto. Answers from the remaining defendants will be transmitted as they are received by counsel.

DATED:     Honolulu, Hawai'i, March 31, 2006.

JOHN M. CREGOR, JR.
Deputy Attorney General
Attorney for Defendants
DEPARTMENT OF PUBLIC
SAFETY, STATE OF HAWAII,
JAMES L. PROPOTNICK, FRANK
LOPEZ, EDWIN SHIMODA,
NOLAN ESPINDA, ERIC
TANAKA, RANDY ASHER, SGT.
SAIA FINAU, CINDA SANDIN,
MONICA LIRTZ, CHERYL
ZEMBIK, LYLE KANOA, G.
SHERIDAN, and DAVID APAO

## RESPONSES TO INTERROGATORIES FROM
## DEFENDANT DAVID APAO

1.    Please state name, position and duties.

    Answer:

    **David Apao.   Sergeant.  Monitor control of inmates.**


2.    Were you trained in regards to prison gang management and control what
    training or instructions did you have concerning policy and procedures
    concerning prison gang members.  When were you trained what was
    involved and how long was the training or instruction.

    Answer:

    **No**


3.    Were you specifically trained or instructed in regards to the challenged
    housing practice of separating prison gangs form rival prison gangs and
    housing them in certain areas of Halawa prison (Quads) to what extent did
    you understand that this housing practice could be applied (in other words
    was it allowed to house a regular inmate (non-gang) member in with
    separated prison gang members.

    Answer:

    **No**

APAO

4.    How long has the practice of separating rival prison gangs been in effect and what  are the reasons for separating the rival prison gangs?

    <u>Answer</u>:

    **Lessen violence with inmates.  Not sure how long been in effect.**

5.    Did you know that a regular inmate (non-gang member) could be housed with separated prison gang members (if answer is Yes what do you think about this practice?)

    <u>Answer</u>:

    **Yes, I know it can be.**

6.    What is a Quad (how many inmates in a Quad) (about how many if exact number is not known).

    <u>Answer</u>:

    **A Quad is an open area with cells.  Exact numbers of cells depends on what facility and what Quad.**

7.    How many separated prison gang members were in a Quad at one time (about how many).

    <u>Answer</u>:

    **Don't know.**

8.    How many separated prison gang members were allowed in a Quad.

    <u>Answer</u>:

    **Don't know.**

9.    What Quads in Halawa Medium and High Security Facility did separated
      prison gangs occupy?

      Answer:

      **Not sure.**


10.   Since rival gangs were separated why didn't they separate regular inmates
      (non-gang) from separated prison gang members?  Do you think they should
      have been separated (why or why not)?

      Answer:

      **Because not required.**


11.   Do you know of any regular inmates that were victimized when housed with
      separated prison gang members (describe).

      Answer:

      **Not to my knowledge.**


12.   What are the policies or practices concerning the housing of a regular inmate
      with separated prison gangs?

      Answer:

      **It's normal.**

13.   How many regular inmates (non-gang) requested protective custody for the last 5 years because they were beaten, threatened, or extorted by separated prison gang members.  (some – a lot – plenty – a whole lot)?

Answer:

**I believe there were some but don't know how many.**


14.   How many Grievances for the last 5 years did you receive or know of that complained of prison gang members threatening, extorting, or assaulting inmates (some – a lot – plenty – a whole lot)?

Answer:

**I don't have access to Grievances.**


15.   Does the separation of rival prison gang members exist in both Medium and High Security Facilities?  Who authorizes?  This when and how long did this exist?

Answer:

**Yes.  I'm not sure of the authorized process.**


16.   Who do you know of including yourself if involved specifically authorized, allowed, approved of the practice of separating rival prison gangs and then housing a regular inmate in with them.  When did you come to know this?

Answer:

**To my knowledge it was authorized by administration.**

17.    When was the prison gang intelligence unit and task force created?  What is there function?  What do they accomplish?  Who is in charge?  And how many make up the task force?

Answer:

18.    Who's decision was it to create the gang task force intelligence unit.  Why was it created or why do you think it was created, when was it created?

Answer:

19.    Are prison gangs a threat and danger to public order and safety (if Yes why if no why).

Answer:

20.    Are prison gangs a threat and danger to regular inmates (if Yes why if no why).

Answer:

**About the same with all inmates.**

21.    What kind of screening procedures and classification procedures were used to determine compatibility between regular inmates (non-gang members) and separated prison gang members that they were ordered to be housed with them.

Answer:

**None to my knowledge but we did respond to complaints.**


22.    Do you know of any abuses in the housing practice such as guards putting a regular inmate or gang member in with separated prison gang members so he will be beaten (names need not be mentioned but may be) describe as best you can.

Answer:

**No way.**


23.    What is the nature and character of prison gangs?  What is there purpose, goals, agenda?

Answer:


24.    Do you know what the right to safe custody policy says.  What do you think it means.

Answer:

**We have obligation to keep inmates safe from foreseeable harm.**

25.   Are you aware that you have a duty to protect prisoners from a foreseeable harm.  Explain what your understanding of this is?

Answer:

**Yes.**

26.   Are prison gangs dangerous and who are they a danger to?  Please describe.

Answer:

**If there is danger it is more between gang members.**

27.   Are prison gangs a threat to prison security?  If Yes why?  If no why?

Answer:

**Yes, they may organize coming into facility and fight with gang members.**

28.   Do you think that housing a regular inmate (non-gang) with 15 separated prison gang members is dangerous to that regular inmate?  If Yes why?  If no why?

Answer:

**Not necessarily.**

29.   [missing]

30.   How many inmates have been injured in gang violence that you know of?  Are there any specific incidents that come to mind.

Answer:

**I don't know of any.**

## RESPONSES TO INTERROGATORIES FROM
## DEFENDANT NOLAN ESPINDA

1.      Please state name, position and duties.

      Answer:

      **Nolan Espinda, Warden.**

      **Duties include administration of large correctional program for the
State of Hawaii.**

2.      Were you trained in regards to prison gang management and control what
training or instructions did you have concerning policy and procedures
concerning prison gang members.  When were you trained what was
involved and how long was the training or instruction.

      Answer:

      **2000 – 2002.  No.**

3.      Were you specifically trained or instructed in regards to the challenged
housing practice of separating prison gangs form rival prison gangs and
housing them in certain areas of Halawa prison (Quads) to what extent did
you understand that this housing practice could be applied (in other words
was it allowed to house a regular inmate (non-gang) member in with
separated prison gang members.

      Answer:

      **I was not trained.  I knew that there was no prohibition to housing gang
and non-gang members together.**

*Espinda*

4.     How long has the practice of separating rival prison gangs been in effect and what  are the reasons for separating the rival prison gangs?

       Answer:

       **The whole period of 2000 though 2002.  Gangs are separated to reduce gang related activity.**


5.     Did you know that a regular inmate (non-gang member) could be housed with separated prison gang members (if answer is Yes what do you think about this practice?)

       Answer:

       **Yes.  Housing gang and non-gang members within individual units is a necessary practice.**

6.     What is a Quad (how many inmates in a Quad) (about how many if exact number is not known).

       Answer:

       **A segment of a block or module.  The number may vary.**


7.     How many separated prison gang members were in a Quad at one time (about how many).

       Answer:

       **Unknown.**

8.    How many separated prison gang members were allowed in a Quad.

    Answer:

    **I do not know of any set limit.**


9.    What Quads in Halawa Medium and High Security Facility did separated prison gangs occupy?

    Answer:

    **All.**


10.    Since rival gangs were separated why didn't they separate regular inmates (non-gang) from separated prison gang members?  Do you think they should have been separated (why or why not)?

    Answer:

    **There is no need to separate gang members from non-gang members.**


11.    Do you know of any regular inmates that were victimized when housed with separated prison gang members (describe).

    Answer:

    **I do not recall 2000 to 2002.**

12.    What are the policies or practices concerning the housing of a regular inmate with separated prison gangs?

Answer:

**See #10.**

13.    How many regular inmates (non-gang) requested protective custody for the last 5 years because they were beaten, threatened, or extorted by separated prison gang members. (some – a lot – plenty – a whole lot)?

Answer:

**Some.**

14.    How many Grievances for the last 5 years did you receive or know of that complained of prison gang members threatening, extorting, or assaulting inmates (some – a lot – plenty – a whole lot)?

Answer:

**Some.**

15.    Does the separation of rival prison gang members exist in both Medium and High Security Facilities? Who authorizes? This when and how long did this exist?

Answer:

**Yes. The facility authorizes the separation of rival prison gang members at both HMSF and HSNF. All of 2000 – 2002.**

*ESPINDA*

16.    Who do you know of including yourself if involved specifically authorized, allowed, approved of the practice of separating rival prison gangs and then housing a regular inmate in with them.  When did you come to know this?

Answer:

**HCF Administration.  Warden, Deputy Wardens (2), Chief of Security, Captains (5), CS II's (2), CS I's (5).**

**All of 2000 - 2002.**

17.    When was the prison gang intelligence unit and task force created?  What is there function?  What do they accomplish?  Who is in charge?  And how many make up the task force?

Answer:

18.    Who's decision was it to create the gang task force intelligence unit.  Why was it created or why do you think it was created, when was it created?

Answer:

19.    Are prison gangs a threat and danger to public order and safety (if Yes why if no why).

Answer:

Espinda

20. Are prison gangs a threat and danger to regular inmates (if Yes why if no why).

   Answer:

   **Not especially.**

21. What kind of screening procedures and classification procedures were used to determine compatibility between regular inmates (non-gang members) and separated prison gang members that they were ordered to be housed with them.

   Answer:

   **Housing by classification is the PRIMARY determining factor in the housing of inmates. Concerns raised, if any, are considered individually.**

22. Do you know of any abuses in the housing practice such as guards putting a regular inmate or gang member in with separated prison gang members so he will be beaten (names need not be mentioned but may be) describe as best you can.

   Answer:

   **No.**

23. What is the nature and character of prison gangs? What is there purpose, goals, agenda?

   Answer:

Espinda

24.    Do you know what the right to safe custody policy says.  What do you think it means.

       Answer:

       **Yes.  Management shall take all reasonable steps to ensure safety of inmates.**


25.    Are you aware that you have a duty to protect prisoners from a foreseeable harm.  Explain what your understanding of this is?

       Answer:

       **Yes.  My understanding is as stated, protection from foreseeable harm.**


26.    Are prison gangs dangerous and who are they a danger to?  Please describe.

       Answer:

       **Yes, to other gang members.  Gang members identify and compete with rival gang members.**


27.    Are prison gangs a threat to prison security?  If Yes why?  If no why?

       Answer:

       **Yes.  Competition against gang members often manifests itself in security threatening activities.**

*Espinda*

28.    Do you think that housing a regular inmate (non-gang) with 15 separated prison gang members is dangerous to that regular inmate?  If Yes why?  If no why?

Answer:

**The actual details would need to be examined for a definitive answer to be determined.  As stated, it is not necessarily automatically dangerous for anyone.**

29.    [missing]

30.    How many inmates have been injured in gang violence that you know of? Are there any specific incidents that come to mind.

Answer:

**Unknown.**

# VERIFICATION

STATE OF HAWAI'I                              )
                                              )      SS.
CITY & COUNTY OF HONOLULU                     )


      I, **DAVID APAO**, being first duly sworn on oath, deposes and says

that the answers to the foregoing responses to request for answers to interrogatories

are true and accurate to the best of my knowledge and belief and that I have the

requisite knowledge and authority to make the foregoing responses.


_____
**DAVID APAO**


Subscribed and sworn to before me this
_____31st_____ day of ____March____, 2006.


_____
Signature of Notary Public, State of Hawai'i

___Marylyn A. Goo___
Printed or Typed Name of Notary Public

My commission expires: _____2/27/08_____

L.S

## VERIFICATION

STATE OF HAWAI'I                    )
                                    )    SS.
CITY & COUNTY OF HONOLULU           )


      I, **NOLAN ESPINDA**, being first duly sworn on oath, deposes and

says that the answers to the foregoing responses to request for answers to

interrogatories are true and accurate to the best of my knowledge and belief and

that I have the requisite knowledge and authority to make the foregoing responses.


                                  _____
                                  **NOLAN ESPINDA**


Subscribed and sworn to before me this
____31st____ day of ____March____, 2006.


_____
Signature of Notary Public, State of Hawai'i

____Marylyn A. Goo____
Printed or Typed Name of Notary Public

My commission expires: ____2/27/08____


L.S.

# VERIFICATION

STATE OF HAWAI'I                         )
                                         )     SS.
CITY & COUNTY OF HONOLULU                )


I, Cinda Sandin  being first duly sworn on oath, deposes and says that the

answers to the foregoing responses to request for answers to interrogatories are

true and accurate to the best of my knowledge and belief and that I have the

requisite knowledge and authority to make the foregoing responses.


_____
CINDA SANDIN


Subscribed and sworn to before me this
____31st____ day of ____March____, 2006.


_____
Signature of Notary Public, State of Hawai'i

____Marylyn A. Goo____
Printed or Typed Name of Notary Public

My commission expires: ____2/27/08____


L.S.

# VERIFICATION

STATE OF HAWAI'I                    )
                                    )      SS.
CITY & COUNTY OF HONOLULU           )


I, Monica Lortz  being first duly sworn on oath, deposes and says that the

answers to the foregoing responses to request for answers to interrogatories are

true and accurate to the best of my knowledge and belief and that I have the

requisite knowledge and authority to make the foregoing responses.

                                    _____
                                    MONICA LORTZ


Subscribed and sworn to before me this
  31st      day of    March        , 2006.


_____
Signature of Notary Public, State of Hawai'i

  Marylyn A. Goo
_____
Printed or Typed Name of Notary Public

My commission expires:    2/27/08

L.S.

# VERIFICATION

STATE OF HAWAI'I                    )
                                   )     SS.
CITY & COUNTY OF HONOLULU          )


I, __Cheryl P. Zembik__, being first duly sworn on oath, deposes and

says that the answers to the foregoing responses to request for answers to

interrogatories are true and accurate to the best of my knowledge and belief and

that I have the requisite knowledge and authority to make the foregoing responses.

_____
CHERYL P. ZEMBIK


Subscribed and sworn to before me this
___31st___ day of ___March___, 2006.


_____
Signature of Notary Public, State of Hawai'i

__Marylyn A. Goo__
Printed or Typed Name of Notary Public

My commission expires: ___2/27/08___


L.S

# VERIFICATION

STATE OF HAWAI'I                              )
                                             )      SS.
CITY & COUNTY OF HONOLULU                    )


I, _____Eric Tanaka_____, being first duly sworn on oath, deposes and

says that the answers to the foregoing responses to request for answers to

interrogatories are true and accurate to the best of my knowledge and belief and

that I have the requisite knowledge and authority to make the foregoing responses.

_____
                    ERIC TANAKA


Subscribed and sworn to before me this
_____31ST_____ day of ___March_____, 2006.


_____
Signature of Notary Public, State of Hawai'i

_Marylyn A. Goo_____
Printed or Typed Name of Notary Public

My commission expires: ___2/27/08_____

L.S.